IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

## STATE OF TENNESSEE v. CHARLES THOMAS JOHNSON

**Appeal from the Circuit Court for Lincoln County**
**No. 2017-CR-44    Forest A. Durard, Jr., Judge**

### No. M2019-00707-CCA-R3-CD

The Defendant, Charles Thomas Johnson, was convicted by a Lincoln County Circuit Court jury of possession of heroin with the intent to sell, possession of heroin with the intent to deliver, possession with the intent to sell 0.5 gram or more of cocaine, and possession with the intent to deliver 0.5 gram or more of cocaine, Class B felonies. *See* T.C.A. § 39-17-417 (2018). After the appropriate merger, the trial court imposed consecutive terms of twelve years for possession with the intent to sell heroin and eight years for possession with the intent to sell cocaine, for an effective twenty years' confinement. The trial court ordered the Defendant to serve his effective sentence consecutively to a conviction in an unrelated case. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion to dismiss pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), based on lost or destroyed evidence, and (3) the trial court erred by denying his request for alternative sentencing and by imposing consecutive service. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Jonathan C. Brown, Clarksville, Tennessee, for the appellant, Charles Thomas Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Robert Carter, District Attorney General; and Ann Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a police encounter with the Defendant that resulted in the discovery of approximately 55.60 grams of heroin and 26.17 grams of cocaine. At the trial, Lincoln County Sheriff's Deputy Eric Hose testified that on March 18, 2016, he received a telephone call and that, based upon the information he received during the call, he "set up" his police SUV "to make a traffic stop" with his police dog. Deputy Hose said that he parked at a fire department for about forty-five minutes before he saw, around midnight, a blue Kia Sorento, for which he had been looking. He said that he followed the Sorento and that Lincoln County Sheriff's Sergeant Mike Pitts responded to the area in an unmarked police truck. Deputy Hose said that while following the Sorento, he and Sergeant Pitt discussed conducting a traffic stop and, alternatively, obtaining a search warrant. Deputy Hose said that the Sorento crossed the center line twice, that he activated his blue lights, and that the Sorento drove about one quarter of one mile before it stopped.

Deputy Hose testified that Rachel Wallace was driving the Sorento and that the Defendant was in the front passenger seat. Deputy Hose said that Ms. Wallace and the Defendant reported having attended a wedding in Atlanta, Georgia, although the Defendant wore gym clothes and Ms. Wallace wore shorts and boots. Deputy Hose said that he told them drugs in the area came from Atlanta and that he asked them if they had drugs inside the Sorento. Deputy Hose said they denied having drugs. Deputy Hose said that he could see inside the cargo area of the Sorento, that he did not see any luggage or clothes, and that he only saw fast food restaurant bags and trash.

Deputy Hose testified that his police dog circled the Sorento twice and that each time the dog "showed . . . a strong odor response" at the rear lift gate. He said that about five minutes elapsed between the time he initiated the traffic stop and the dog's indicating it detected the odor of drugs. Deputy Hose said that Ms. Wallace and the Defendant got out of the Sorento, that they were separated, and that Deputy Hose searched the Sorento. Deputy Hose said that Deputy Nathan Massey arrived at the scene and assisted with the search and that members from an Alabama law enforcement agency responded to the scene, as well. Deputy Hose said that he and Deputy Massey did not find drugs inside the car. Deputy Hose said that when he searched the car, Ms. Wallace reported having the drugs and that a female deputy was requested to respond to the scene. Deputy Hose said that he provided Ms. Wallace a warning citation for the traffic violation, which was received as an exhibit, and that he did not recall any further involvement in this case.

Deputy Hose testified that he wore a body camera at the time of the traffic stop, that his camera was activated, and that to his knowledge the camera recorded audio and video at the scene. He said that footage from his body camera only showed what was within his view. He said that his police SUV had a dash camera at the time of the traffic stop, that

-2-

the camera was activated when he turned on his blue lights, and that the camera should have recorded the traffic stop. He said that Ms. Wallace was not within view of either camera during the traffic stop and that he was not present when Ms. Wallace spoke to Sergeant Pitts at the scene. Deputy Hose said that the next day, he provided the "SD" cards from the body and dash cameras to Jubal Ragsdale, a Lincoln County Sheriff's drug investigator, who downloaded the recordings to the police computer system. Deputy Hose said that to his knowledge, the recordings were downloaded properly. Deputy Hose said, though, that Investigator Ragsdale had not been able to retrieve the recordings from the police computer system.

On cross-examination, Deputy Hose testified that his police dog scratched and sat when he "hit on something." He said that, in this case, the dog scratched and sat at the rear left side of the Sorento. He agreed that based upon air flow inside the Sorento and the dog's reaction, the odor of drugs would have come from the driver's side of the Sorento. He agreed that his supervisor instructed him to conduct a traffic stop if possible but denied that he previously testified he was going to stop the Sorento "no matter what." He said that he and Sergeant Pitts followed the Sorento for about four or five minutes, or two or three miles, before conducting the traffic stop. Deputy Hose said that he and Sergeant Pitts followed the Sorento after it crossed the center line and that the traffic stop was conducted on another roadway without marked lines. Deputy Hose agreed that the dash camera would have captured the traffic violation. He said that generally, he did not use his dog during a routine traffic stop but that "[b]ased upon our prior knowledge," the dog was used in this case.

Deputy Hose testified that Ms. Wallace consented to the search of the Sorento. He said that although the Defendant was not wearing wedding-appropriate attire, it was common to wear comfortable clothes when traveling. Deputy Hose said that the search of the Sorento lasted about one and one-half hours. He said that Ms. Wallace and the Defendant were not under arrest during the search but were not free to leave. Deputy Hose said that although a female deputy was requested, one did not come to the scene. He said that no drugs were found on the Defendant. Deputy Hose said that he learned from other deputies at the scene that the drugs had been inside Ms. Wallace's vagina.

Deputy Hose testified that he thought the recordings from his dash and body cameras had been downloaded to the police computer system. He conceded that if the recordings were lost, it was the result of negligence by the sheriff's office. He said that to his knowledge, "something happened with the computer system." He said that he saw the drugs Ms. Wallace had concealed after the drugs had been placed inside an evidence bag. He did not take photographs of the drugs, did not know if anyone took photographs, and was surprised no photographs were contained in the discovery materials. He said that Sergeant Pitts "located" the drugs and had described them as being the "size of hockey

-3-

pucks." He agreed it would have been difficult for Ms. Wallace to have placed the drugs inside her vagina while driving. He agreed he had never arrested a person for constructive possession of a controlled substance when the controlled substance was inside another person's body.

Lincoln County Sheriff's Sergeant Mike Pitts testified that he worked with the "STAC Unit" to investigate drug cases and the drug trade market. He said the unit included about five or six law enforcement agencies, including federal agencies and a few from Huntsville, Alabama. Sergeant Pitts stated that about one month before the incident in this case, he learned of the Defendant and Ms. Wallace from the STAC unit. Sergeant Pitts said that STAC provided information related to the Defendant's and Ms. Wallace's moving into a home in Lincoln County. Sergeant Pitts confirmed that Ms. Wallace and the Defendant lived at the home after obtaining license plate numbers and vehicle registrations. Sergeant Pitts said that it was common for a drug dealer to utilize a chauffeur because it provided a status symbol, created a distraction for law enforcement, and allowed for the "muling" of drugs between locations.

Sergeant Pitts testified that mid-morning on March 17, 2016, STAC provided him with information related to the Defendant and that as a result, he requested the assistance of multiple sheriff's deputies to conduct a traffic stop of the Sorento. He said that if a traffic stop were not possible, he asked the deputies to follow the Sorento and attempt to obtain a search warrant. He said that he received additional information from STAC about the route the Sorento was traveling and that he relayed the information to the deputies. He said he arranged for Deputy Hose to park along the Sorento's anticipated route.

Sergeant Pitts testified that he saw the Sorento, that he followed it, and that the Sorento traveled off the shoulder of the highway, crossed the fog line, and returned to its lane of travel. He said that the Sorento also "drifted across" the center and fog lines. He said that he communicated with Deputy Hose, who was parked at a fire department, to inform Deputy Hose when the Sorento would reach Deputy Hose's location. Sergeant Pitts stated that Deputy Hose followed him and the Sorento after he and the Sorento passed the fire department and that Deputy Hose initiated the traffic stop. Sergeant Pitts said that the Sorento stopped about one quarter of one mile after Deputy Hose turned on the blue lights. Sergeant Pitts acknowledged that the recordings from Deputy Hose's dash and body cameras had been lost because the police computer system "crashed."

Sergeant Pitts testified that during the traffic stop, Deputy Hose handed him Ms. Wallace's identification and that Sergeant Pitts told Deputy Hose to take his police dog around the Sorento as Sergeant Pitts checked for outstanding warrants. Sergeant Pitts stated that after the dog indicated the presence of drugs, he instructed Deputy Hose to separate Ms. Wallace and the Defendant and to search the Sorento.

Sergeant Pitts testified consistent with Deputy Hose's testimony regarding Ms. Wallace's and the Defendant's clothes and stated that there was no luggage inside the Sorento. Sergeant Pitts said that Ms. Wallace shook, sweated profusely, stuttered, and hesitated before she answered questions. Sergeant Pitts stated that the Defendant sweated profusely, would not provide "direct" answers, and looked away when he answered questions.

Sergeant Pitts testified that Ms. Wallace wanted to speak with him privately because she did not want the Defendant to overhear. Sergeant Pitts said Ms. Wallace initially stated that drugs were inside the console but later admitted she had them. He said that Ms. Wallace retrieved the drugs from her vagina. He said that she retrieved a plastic bag containing three objects. He described the objects as one ounce "cookies." He said that two of the cookies had an off-white color and were consistent with heroin and that the third cookie was white and was consistent with powder cocaine.

Sergeant Pitts testified that he "loudly" requested a female deputy come to the scene to pat down Ms. Wallace because he wanted the Defendant to think Ms. Wallace was not cooperating with the deputies. Sergeant Pitts said that the deputies continued searching the Sorento after Ms. Wallace provided the drugs.

Sergeant Pitts testified that he spoke to the Defendant, who initially reported attending a wedding in Atlanta, but that the Defendant later admitted meeting a person in Atlanta to purchase cocaine and heroin. Sergeant Pitts said that the Defendant admitted purchasing drugs from this person eight to ten times and that the Defendant usually purchased two ounces of heroin and one ounce of cocaine but sometimes one additional ounce of each. Sergeant Pitts said that the Defendant reported paying $5800 for the drugs found at the scene. Sergeant Pitts said that the Defendant never said what he intended to do with the cocaine but that the Defendant said he broke down the heroin based upon "the point system," which the sergeant said involved dividing heroin into one-tenth of one gram amounts, and sold each for $30. Sergeant Pitts said the point system was common in heroin sales. He said that the Defendant did not identify where he intended to sell the heroin, only how he "broke it down and sold it." Sergeant Pitts said that based upon the official analysis, the heroin weighed around two ounces and that the cocaine weighed around one ounce. He said that powder cocaine was "cooked" in order to create crack cocaine.

Sergeant Pitts testified that during the traffic stop, the Defendant admitted that he had possession of the drugs before the traffic stop, that he gave the drugs to Ms. Wallace when he realized they were being stopped by the police, and that she had the drugs. Sergeant Pitts said that although the Defendant claimed ownership of the heroin, the Defendant did not claim ownership of the cocaine. Sergeant Pitts said that the Defendant admitted purchasing the cocaine but denied it was for him. Sergeant Pitts said that the

Defendant was arrested and taken to jail and that the Defendant had $482 at the time of the arrest. Sergeant Pitts believed, based upon his training, that the money was proceeds from drug sales. He said that Ms. Wallace left the scene with STAC team members from Alabama because she decided to cooperate with them.

Sergeant Pitts testified that he, along with Tennessee Bureau of Investigations (TBI) Special Agent Ryan Dalton, spoke to the Defendant at the jail at the Defendant's request. Sergeant Pitts said that the Defendant again admitted purchasing the cocaine but denied it was for him.

On cross-examination, Sergeant Pitts testified that he followed the Sorento for approximately thirty to fifty miles, which included several miles before the Sorento entered Lincoln County. Sergeant Pitts agreed that the Defendant did not have any contraband at the time of the stop.

Sergeant Pitts testified that he did not record his conversation with the Defendant at the scene. Sergeant Pitts said that the conversation occurred in front of Deputy Hose's police SUV and that, based upon their location, the dash camera would have recorded the tops of their heads. Sergeant Pitts said that the dash camera would have only recorded audio of the conversation if Deputy Hose had been standing beside them. Sergeant Pitts said that Deputy Hose was several feet away at this time. Sergeant Pitts said that after he learned the dash and body camera recordings had been lost due to a computer malfunction, he contacted everyone he could think of to help retrieve the recordings.

Sergeant Pitts testified that he provided *Miranda* warnings to Ms. Wallace and to the Defendant after the police dog indicated the presence of drugs. Sergeant Pitts said that a STAC team member was present when Sergeant Pitts spoke to Ms. Wallace. Sergeant Pitts said he spoke to the Defendant alone. Sergeant Pitts stated that he took photographs of the drugs at the scene, that the photographs would have been downloaded with the "audio and video of that," and that after trial counsel questioned Deputy Hose about photographs the previous day of the trial, Sergeant Pitts found two photographs on his cell phone. Sergeant Pitts agreed that the photographs had not been provided to the prosecutor and to the defense. Sergeant Pitts said that he had forgotten the photographs were on his phone and agreed that this was "more negligence" by the sheriff's office.

Sergeant Pitts testified that although police documents reflected that the drugs were recovered from the Defendant, the drugs were recovered from Ms. Wallace. When asked if the Defendant could have exercised dominion and control over the drugs when the drugs were inside Ms. Wallace's body, Sergeant Pitts said that he did not "know what kind of relationship he and Ms. Wallace had" and that she might have allowed the Defendant to

place the drugs inside her body. Sergeant Pitts said, though, that the Defendant had possession of the drugs until the blue lights were activated.

Rachael Wallace testified that she met the Defendant in 2016, that she lived in her car at this time, that they began a romantic relationship, and that the Defendant became a means of financial support. She said that she and the Defendant rented a home, that her name was on the rental agreement at the direction of the Defendant and his brother, Wayne Johnson, and that Mr. Johnson paid rent. She said, though, the Defendant did not stay overnight at the home. She said that the Defendant and Mr. Johnson owned a construction company in Huntsville, Alabama.

Ms. Wallace testified that at the time of the offenses, she drove a blue 2008 Kia Sorento and that she drove the Defendant, whom she referred to as "Mr. Bossman," to various places. She said that the Defendant "called the shots" and that she did what she was told. She said that in March 2016, the Defendant told her he wanted to purchase heroin and cocaine in Atlanta and return to Tennessee. She said that he knew she needed money, that he told her when they were leaving, and that they left. She described herself as the Defendant's transportation, although the Defendant owned a truck. She said that it was the Defendant and Mr. Johnson's idea to travel to Atlanta to pick up drugs in her Sorento. She said that she, the Defendant, and Mr. Johnson discussed what to do if she and the Defendant were stopped by the police and that Mr. Johnson and the Defendant told her to place the cocaine and heroin inside her vagina. When asked why the Defendant instructed her to place the drugs inside her body, she said police dogs could not smell drugs from there. She said that the Defendant likewise instructed her to tell any police officers that they had been to a wedding, which was untrue.

Ms. Wallace testified that on March 17, 2016, the Defendant told her to pick him up at the construction company, that she picked up the Defendant around lunchtime, that they wore casual attire, and that the Defendant drove the Sorento to Atlanta. She said she suspected but was uncertain that they were under police surveillance at this time. She recalled one stop during the drive to Atlanta and said the Defendant paid for gasoline and food. She said the Defendant carried "a significant amount" of money, although she did not recall the amount. She said that the Defendant drove to a laundromat parking lot in Atlanta, that she remained inside the Sorento, that the Defendant walked to a man inside another vehicle, and that the Defendant returned to the Sorento a few minutes later. She said that the Defendant did not show her the drugs at this time and that the Defendant drove to a convenience store. She said that at the Defendant's direction, she began driving the Sorento toward Tennessee.

Ms. Wallace testified that after she and the Defendant entered Tennessee, she told the Defendant that she thought they were being followed. She said that the Defendant told her it would be okay and that he handed her the heroin and cocaine, which "came from somewhere on his person or in the car." She said that she saw police blue lights, that she knew what to do with the drugs based upon the previous conversation, and that she placed the drugs in her vagina while she drove. She said that she did not stop the car until she could "safely pull over to stop" because the road was curvy. She said that in order to place the drugs inside her vagina, she "stood up on the brake and slid them down my pants and into me." She said she pressed one foot to lift up her body and bottom. She said that the Defendant became frustrated because he wanted her to continue driving.

Ms. Wallace testified that after the police dog circled the Sorento, the deputies asked her and the Defendant to get out of the Sorento and that they were separated. She said she initially hesitated when answering the deputies' questions because she feared the Defendant "and them" would hurt her if she gave the drugs to the deputies. She said that at this time, she and the Defendant were the only persons who knew where the drugs were located. She said that she expressed her fear to the deputies, that the deputies decided to announce the request for a female deputy to search Ms. Wallace, and that the deputies made the announcement to make the Defendant think she was not cooperating with the deputies. She said that she removed the drugs from her vagina and gave the deputies two "cookies" of heroin and one "ball" of cocaine.

Ms. Wallace testified that the Defendant planned the trip to Atlanta to purchase the drugs, that she did not arrange any aspect of the "drug deal," and that she did not provide any money used to purchase them. She said that she had been served with a subpoena and that she had not received any "deal or promise" from the prosecutor in exchange for her testimony.

On cross-examination, Ms. Wallace testified that she did not have a criminal history and that she had never been arrested for any drug-related offense. She said she last smoked a marijuana cigarette the week before the trial. She said that she did not "hang around" drug dealers but that she associated with "the occasional smoker." She disputed that the drugs she removed from her body were the size of three hockey pucks. She said that it took her less than one minute to place the drugs inside her body as she stopped the car.

Ms. Wallace testified that she had not been charged with a criminal offense in connection with this case. She said the deputies told her she would be able to go home if she told them where the drugs were located. She agreed that after she placed the drugs inside her body, she exercised physical possession of them but that "fear controls you a lot." She said that she did not provide any written statements or sign any documents.

TBI Special Agent John Scott, Jr., an expert in forensic chemistry, testified that he analyzed the substances in this case. He determined that the white powdery substance was cocaine hydrochloride, a schedule II controlled substance, and weighed 26.17 grams. He said that the two tan rock-like substances contained heroin, a schedule I controlled substance, and that the total weight was 55.60 grams.

Retired Lincoln County Sheriff's Investigator Jubal Ragsdale testified for the defense that he and Sergeant Pitts had been partners before Mr. Ragsdale's retirement in November 2016. Mr. Ragsdale stated that he owned a technology business that manufactured dash and body cameras for law enforcement agencies and that his business' dash cameras were installed in the sheriff's deputies' vehicles at the time of the present offenses. He said that his business's body cameras were also utilized by the sheriff's office at the time of this case.

Mr. Ragsdale testified that he was unsure if the dash and body camera recordings relevant to this case were provided to him in order for the recordings to be downloaded to the police computer system. He said that downloading a recording had not been a part of his official duties but that some of the deputies had difficulty using the computer and asked for his assistance. He said that each deputy was responsible for ensuring that a recording was saved properly to the police computer system.

Mr. Ragsdale testified that he was not involved in this case because he was out of town. He said that each deputy had a computer for which the deputy was responsible.

On cross-examination, Mr. Ragsdale testified that he attempted to locate the recordings in this case but that he was unsuccessful. He said he learned after he retired that the computer he had used in the sheriff's office had "crashed" and was replaced. He agreed, though, that the computer "would have been backed up." He said that the recordings were not on the "backup drive" and that, as a result, either Deputy Hose did not provide the recordings to Mr. Ragsdale or Mr. Ragsdale was not the person who saved the recordings to the computer system.

Upon this evidence, the jury convicted the Defendant as charged. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He argues that Ms. Wallace's testimony is insufficient to establish that the Defendant purchased and possessed the heroin and cocaine before Deputy Hose conducted the traffic stop. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is a crime to "[p]ossess a controlled substance with intent to . . . deliver or sell [a] controlled substance." T.C.A. § 39-17-417(a)(4). Delivery is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." *Id*. § 39-17-402(6) (2014). A sale is "a bargained-for offer and acceptance, and an actual or constructive transfer or delivery" of the substance. *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). Possession with the intent to deliver heroin and possession with the intent to sell heroin are Class B felonies. T.C.A. § 39-17-417(b); 39-17-406(c)(11) (2018). Possession with the intent to deliver 0.5 gram or more of cocaine and possession with the intent to sell 0.5 gram or more of cocaine are likewise Class B felonies. *Id*. § 39-17-417(c)(1). "It may be inferred from the amount of the controlled substance or substances possessed by an offender, along with other relevant facts . . . , that the controlled substance or substances were possessed with the purpose of selling or other dispensing." *Id*. § 39-17-419 (2018).

"Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "The mere presence of a person in an area where [an object is] discovered is not, alone, sufficient to support a finding that the person possessed the object." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

In the light most favorable to the State, the evidence shows that Ms. Wallace was homeless and needed money when she met the Defendant. She referred to the Defendant as "Mr. Bossman," who became a means of financial support. Ms. Wallace said that the Defendant "called the shots," that she did what she was told, and that she was his transportation. Sergeant Pitts testified that is was common for a drug dealer to utilize a chauffeur because it provided a status symbol, created a distraction for law enforcement, and allowed for the smuggling of drugs between locations. The Defendant told Ms. Wallace that he wanted to purchase cocaine and heroin in Atlanta, Georgia, that he told her when to pick him up, and that they left for Atlanta. The Defendant, who carried a significant amount of money, drove Ms. Wallace's Sorento to a laundromat parking lot in Atlanta. The Defendant approached a man sitting inside another vehicle and returned to the Sorento a few minutes later. The Defendant drove to a convenience store, at which time Ms. Wallace began driving toward Tennessee. Ms. Wallace told the Defendant they were being followed, and the Defendant handed her the heroin and cocaine he had purchased in Atlanta. When Ms. Wallace saw the blue lights on Deputy Hose's police SUV, she placed the drugs inside her vagina. Before leaving for Atlanta, the Defendant and his brother told Ms. Wallace to place the drugs inside her vagina if she and the Defendant were stopped by the police because police dogs would not be able to smell the drugs from there. The substances that Ms. Wallace retrieved from her body included 26.17 grams of cocaine and 55.60 grams of heroin.

During the traffic stop, the Defendant admitted to Sergeant Pitts that he had purchased the heroin and cocaine from a person in Atlanta and that he had purchased the drugs from the person about eight to ten times. The Defendant admitted purchasing two ounces of heroin and one ounce of cocaine for $5800. Although the Defendant stated the cocaine was intended for another person, he described breaking down the heroin based upon "the point system" and selling each amount for $30. Sergeant Pitts said that the point system was common in heroin sales. The Defendant likewise admitted to Sergeant Pitts that he had possession of the drugs before the traffic stop and that he gave the drugs to Ms. Wallace when he realized they were being stopped by the police. At the time of the Defendant's arrest, he had $482, which Sergeant Pitts believed, based upon his training and experience, was proceeds from drug sales.

We conclude that the evidence is sufficient. The Defendant admitted to purchasing and to possessing the heroin and cocaine before he handed the drugs to Ms. Wallace at the time of the traffic stop. The Defendant described the manner in which he broke down and sold heroin for $30. This evidence is sufficient to support the Defendant's convictions for possession with the intent to sell and possession with the intent to deliver heroin. The Defendant admitted that he purchased the cocaine and that the cocaine was purchased for a third party. The jury's verdicts reflect that it credited the testimony of Ms. Wallace and Sergeant Pitts and found that the Defendant intended to sell the cocaine, as well. *See Bland*,

958 S.W.2d at 659. Based upon the amount of cocaine seized, the jury was permitted to infer that the cocaine was possessed for the purpose of selling or delivery. *See* T.C.A. § 39-17-419. We conclude that the evidence is sufficient to support the Defendant's convictions for possession with the intent to sell and possession with the intent to deliver 0.5 gram or more of cocaine. The Defendant is not entitled to relief on this basis.

## II.     Lost or Destroyed Evidence

The Defendant contends that the trial court erred by denying his motion to dismiss pursuant to *Ferguson* based upon the lost or destroyed evidence of the recordings from Deputy Hose's dash and body cameras utilized at the time of the traffic stop. The Defendant argues that the State was "intentional and grossly negligent" by not preserving the evidence and that a jury instruction regarding lost evidence was insufficient to ensure a fair trial. The State responds that the trial court did not err by denying the motion and by providing a jury instruction relative to the State's duty to preserve evidence. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Id.* A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791.

Initially, the Defendant filed a motion to suppress evidence on an unrelated basis. However, during the motion hearing, witness testimony indicated that the recordings from Deputy Hose's dash and body cameras had not been provided to the defense. Our recitation of the evidence from the suppression hearing is limited accordingly.

At the suppression hearing, Deputy Hose testified that he provided the recordings from his police SUV dash and body cameras to Mr. Ragsdale and that Deputy Hose did not know what happened to the recordings. Deputy Hose said that he had not seen the video recordings since the date of the offenses, that he had not reviewed them, and that he had not deleted or erased them. He did not know if anyone had reviewed the recordings since he submitted them to be downloaded to the police computer system. Deputy Hose stated that when he turned on the blue lights to his SUV, the dash camera began recording thirty seconds before the lights were activated. He could not explain why the recordings had not been provided to the defense.

Sergeant Pitts testified that his conversation with the Defendant at the scene was not recorded but that the Defendant's statement the following day at the jail was recorded.

-13-

Sergeant Pitts stated that he did not take photographs of the drugs after Ms. Wallace removed them from her body.

Sergeant Pitts testified that he had not reviewed the dash and body camera recordings. He assumed that Mr. Ragsdale downloaded the recordings to the police computer system if Deputy Hose provided the recordings to Mr. Ragsdale. When asked why the recordings had not been provided to the defense, Sergeant Pitts stated, "We have not found the video." He said that he had looked in the electronic file folder where the recordings should have been but that the recordings were not there.

After the trial court denied the Defendant's motion to suppress, the Defendant filed a motion to compel the State to provide the recordings from Deputy Hose's body and dash cameras. The Defendant likewise filed a motion to dismiss the indictment pursuant to *Ferguson* because the State had failed to preserve the recordings and because the recordings had been potentially exculpatory.

At the hearing on the motion to dismiss, Mr. Ragsdale testified that he retired from the Lincoln County Sheriff's Office in November 2016. He said that although he retired from law enforcement, he owned a company that manufactured video evidence equipment for law enforcement. He said that he formed the company in 2008 and that his equipment was used by the Lincoln County Sheriff's Office at the time of the present case.

Mr. Ragsdale testified that at the time of this case, the sheriff's office did not have a written policy regarding the protocol for downloading video recordings. He said that a deputy saved any recording the deputy thought needed to be saved. He said that the deputy would eject the "SD" memory card from the device, put it in a computer, and transfer the recording to the police computer system. He said that every deputy had an individualized computer system and that the sheriff's office did not have a universal computer network.

Mr. Ragsdale testified that body cameras were activated by a manual button. He said the cameras recorded over previous files after a period of time in order to prevent a situation in which a deputy activated a camera but it did not record. He said that the dash cameras automatically recorded when a deputy turned on the blue lights. He said that his company did not install dash and body cameras and that installation was completed by a third-party contractor. He said, though, that if a deputy had a "minor" issue or wanted "to check [the] menu," the deputy could come to his office to have the camera examined. Mr. Ragsdale said that if a problem could not be resolved at his office, the deputy had to call the company who installed the camera.

On cross-examination, Mr. Ragsdale testified that everyone knew his company manufactured the cameras used by the sheriff's office and that a third party purchased the

cameras from his company and donated them to the sheriff's office. Relative to the dash cameras, he said that in addition to recording automatically when the blue lights were activated, a deputy could turn on the camera manually, which was common in driving under the influence cases. He said, though, that a dash camera could not be turned off manually if the blue lights were on.

Mr. Ragsdale testified that although the sheriff's office did not have a written policy regarding a deputy's downloading dash and body camera recordings, the general protocol was for each deputy to download a recording to the deputy's computer. He said that if a deputy had difficulty downloading a recording because the deputy was not "computer literate," the deputy asked Mr. Ragsdale to download the recording. He said that the deputies knew to ask him because he was "the de facto computer nerd," not because he was an official custodian of video recordings. He said that an SD card was removed from a recording device and inserted into a computer and that any recording on the device was downloaded onto the computer's hard drive only, not a network.

Mr. Ragsdale did not recall the recordings in this case and said that the first time he heard the Defendant's name was "when this came up." He said, though, that about one or two months after his retirement, the computer he used at the sheriff's office "crashed," that the computer contained "a lot of videos on it," and that none of the files on the computer could be retrieved. He said that he examined an "old driver that some of the backup systems were on" to determine if the recordings in this case were on the driver but that the recordings were not on it.

On redirect examination, Mr. Ragsdale clarified that all deputies used the same computer to download recordings and that this single computer was not "backed up to any other hard drive."

Deputy Hose testified that at the time of the traffic stop, he turned on his body camera and that his dash camera turned on when he activated his blue lights. He said his procedure to save video recordings from his dash camera was to remove the SD card from the device, provide it to Mr. Ragsdale, and for Mr. Ragsdale to download the recording to the computer. He said that that Mr. Ragsdale returned the card afterward. Deputy Hose said he provided the entire body camera to Mr. Ragsdale. Deputy Hose said that he followed these procedures for each device in this case. He said that he provided the recordings to Mr. Ragsdale within two or three days of the traffic stop. Deputy Hose said that he did not watch the recordings and that he did not verify the recordings had been downloaded to the computer.

Deputy Hose testified that at the preliminary hearing, he stated that the recordings had been saved to the computer system. He said that at the time of his preliminary hearing

testimony, he thought the recordings had been downloaded to the computer system. He said that he first learned the recordings were not on the computer after trial counsel filed a request for discovery materials. Deputy Hose said that after he learned the recordings were not on the computer, Sergeant Pitts attempted to locate them.

Deputy Hose was unaware of a written policy about downloading video recordings and was unaware if the computer on which the recordings were saved went through a backup process. He said that he had never saved a recording to the sheriff's office computer system because he did not have access to it and that the narcotics division, which included Sergeant Pitts and Mr. Ragsdale, had access.

On cross-examination, Deputy Hose testified his usual practice of handing the SD card and the body camera to Mr. Ragsdale had been successful previously and that he continued following this procedure. Deputy Hose said that he intended for the recordings in this case to be downloaded to the computer in order for them to be used at the trial. He said that he learned the computer "crashed" sometime after he provided the recordings to Mr. Ragsdale and that he was not involved with the crash.

On redirect examination, Deputy Hose testified that he was required to preserve the recordings. He said that his dash camera had not malfunctioned. He said that he had not worn a body camera for about six weeks at the time of the motion hearing because the cameras began "cutting on and off" and that the sheriff's office was "looking at purchasing" different cameras. On recross-examination, he said that he had not experienced any problems with the body camera he wore at the time of the offenses. He said that it took about five minutes for Mr. Ragsdale to download the recordings in this case and that, to his knowledge, the download completed without issue.

Sergeant Pitts testified that although he stated at the preliminary hearing that the dash and body camera recordings existed, he never watched the recordings and assumed they had been preserved. He said that a deputy did not provide him with the devices in order for him to download the recordings and that a deputy provided the devices to whomever downloaded recordings. He said that Mr. Ragsdale was usually the person who downloaded the recordings at the time of the offenses. Sergeant Pitts said that after Mr. Ragsdale retired, Deputy Chris Thornton began downloading the recordings.

Sergeant Pitts testified that he was unaware of a written policy relative to downloading a recording to the police computer system. He did not know if recordings were downloaded to a single computer or to many computers. He was unaware of a computer network at the sheriff's office. He said that he looked for the recordings in this case on the computer in his office, which he said was not the same computer in the deputies' lounge. He said that he did not look for the recordings on the computer in the lounge.

Sergeant Pitts testified that, generally, he did not review recordings and that he learned the recordings were "missing" when trial counsel requested discovery materials. Sergeant Pitts said that the computer crash occurred not long after Mr. Ragsdale retired at the end of 2016 or the beginning of 2017. Sergeant Pitts said that the computer crash did not involve the computer in his office and that the computer "in the drug office" crashed. He said that the drug office had three computers but that he did not know if the computers were "linked." He thought the computers were backed up, though.

The trial court questioned the prosecutor about the State's efforts to locate the recordings. The prosecutor stated that she had not contacted "outside vendors" who specialized in the recovery of lost data. The court noted that testimony in other cases from TBI personnel showed that "they can get just about anything from any computer regardless of what happened to it." The prosecutor stated that she had talked "above and beyond" to the witnesses at the motion hearing, that she talked to Deputy Thornton, and that she "left it at that because they tell me [it's] gone." The prosecutor offered to contact the TBI to have someone "check further," but she noted that the computer at issue was not at the sheriff's office any longer.

In a written order, the trial court denied the motion to dismiss the indictment based upon the State's failure to preserve the dash and body camera recordings. The court determined that the State had a duty to preserve the recordings, which were subsequently destroyed. The court found that the State breached its "duty of care" in the destruction of the recordings before the Defendant had an opportunity to review them. However, the court determined, based upon the witness testimony, that the destruction of the recordings was unintentional and was the result of "simple" negligence.

The trial court found that the evidence had the potential exculpatory value to refute the assertions of the deputies that the Defendant claimed ownership of the drugs, that the Defendant was inside the Sorento that violated the rules of the roadway, and that the police dog indicated the presence of drugs inside the Sorento. The court determined that no other evidence could substitute for the recordings but that the Defendant later made incriminating statements during a police interview at the jail. The court likewise found that the Defendant and Ms. Wallace had been tracked by multiple law enforcement agencies during the drive between Lincoln County and Atlanta, Georgia. The court determined that a dismissal of the indictment was not warranted in this case because a dismissal was reserved for the most egregious incidents involving lost or destroyed evidence. The court found that the destruction of the recordings was caused by a computer malfunction, which did not constitute gross negligence or intentional destruction of evidence. The court determined, though, that the Defendant was entitled as a matter of fairness to a jury instruction regarding lost or destroyed evidence. The court stated that if the Defendant wanted an additional instruction, he should submit a proposed instruction to the court and to the prosecutor.

-17-

The final jury instructions reflect that the trial court provided an instruction relative to the duty to preserve evidence, which was as follows:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through other reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence. If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

*See* T.P.I. – Crim. 42.23 Duty to Preserve Evidence (23rd ed. 2019).

The parties do not dispute that the State had a duty to preserve the recordings from the dash and body cameras. *See Ferguson*, 2 S.W.3d at 917. In evaluating the degree of negligence involved, we note that the record is inconsistent about the procedure each deputy followed when downloading a recording at the sheriff's office and about whether a single computer or multiple computers were used for this purpose. However, Deputy Hose consistently testified that he turned on his body camera, that his dash camera turned on when he activated his blue lights, that he thought both cameras operated properly at the time of the traffic stop, and that he provided the SD card and the body camera to Mr. Ragsdale to download the recordings to the police computer system. Although Mr. Ragsdale did not recall downloading the recordings in this case to the computer system, he did not dispute Deputy Hose's testimony that Deputy Hose provided the recordings to him. The testimony likewise reflects that the computer Mr. Ragsdale used to download recordings subsequently "crashed" and that the recordings could not be retrieved. Therefore, the record reflects that the nonexistence of the recordings occurred through inadvertence and was due to an equipment malfunction, rather than gross negligence or willful misconduct in maintaining a copy of the recordings and providing it to the defense. *See Merriman*, 410 S.W.3d at 793.

We consider, next, the significance of the unavailable evidence in light of the other, available evidence and the sufficiency of the other evidence to support the convictions. *See id*. The events that transpired during the traffic stop were a significant component of the State's proof. However, Deputy Hose and Sergeant Pitts provided detailed testimony about the sequence of events during the traffic stop, and Ms. Wallace provided detailed testimony about the Defendant's involvement in the purchase and possession of the heroin and

cocaine. In addition, Sergeant Pitts testified about the Defendant's inculpatory statements at the scene that he had purchased the heroin and cocaine and that he had possessed the drugs until he realized he and Ms. Wallace were being stopped by the police. According to Sergeant Pitts, the dash camera would have only recorded the tops of his and the Defendant's heads during their conversation and would not have recorded audio because Deputy Hose was some distance away. Furthermore, the defense established during its cross-examination of the State's witnesses that the recordings had been lost or destroyed, highlighting the negligence involved. The defense, likewise, cross-examined Ms. Wallace extensively about what occurred during the traffic stop, which was generally consistent with the testimony of Deputy Hose and Sergeant Pitts.

Upon consideration of these factors, we conclude that the trial court did not err by determining that the Defendant could receive a fundamentally fair trial protected by adequate curative measures and that a dismissal was not warranted. We likewise conclude that the court's jury instruction was an appropriate and adequate remedy for the absence of the dash and body camera recordings. The Defendant is not entitled to relief on this basis.

The Defendant likewise asserts in his brief that the State violated *Ferguson* in connection with two photographs of the cocaine and heroin taken by Sergeant Pitts at the scene. Throughout the numerous pretrial hearings at which Sergeant Pitts testified, he maintained that nobody took photographs at the scene. However, Sergeant Pitts testified for the first time at the trial that he had taken two photographs of the heroin and cocaine at the scene with his cell phone but that he had forgotten about the photographs until his trial testimony. The Defendant attempts to connect the photographs to the lost or destroyed recordings from the dash and body cameras pursuant to *Ferguson*. However, the record does not reflect that the photographs were lost or destroyed, only that they were not disclosed until the trial. The Defendant nonetheless asserts that the State violated *Brady v. Maryland* by failing to disclose the two photographs. We will address the photographs in this context.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

Evidence that provides value for impeachment of a state's witness is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The critical inquiry remains, though, whether the evidence was material. In this regard, the inquiry is whether a reasonable probability exists that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see Edgin*, 902 S.W.2d at 391 (op. on pet. for reh'g).

In *Kyles*, the Supreme Court observed:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

The record reflects that the Defendant filed a discovery request which included a request for disclosure of *Brady* materials. *See Edgin*, 902 S.W.2d at 389 (stating that a defendant must request the information, absent obvious exculpatory character). The parties do not dispute that the existence of the two photographs was not disclosed by Sergeant Pitts until the trial and that the photographs depicted the heroin and cocaine retrieved from Ms. Wallace's body. Sergeant Pitts testified on cross-examination at the trial that he had forgotten about the two photographs until trial counsel questioned Deputy Hose at the trial about the lack of photographs in the discovery materials. *See id.* (stating that the State must have suppressed the information). The record does not reflect that counsel requested a recess to have the opportunity to review the photographs or a jury-out hearing to address the State's failure to disclose the photographs during the discovery process. The record reflects that at the conclusion of the State's case-in-chief, the defense renewed its "*Ferguson* Motion" based upon the photographs. The court determined that the

photographs should have been disclosed to the defense. In denying the motion, the court found that although the photographs would have been inculpatory and would have corroborated witness testimony, the State did not seek to admit them.

The record supports the trial court's determinations that the photographs were inculpatory and would have corroborated the testimony of Ms. Wallace and Sergeant Pitts about the events during the traffic stop. *See id.* (stating that the information must be favorable to the accused). In any event, the evidence was not material because even if "the evidence had been disclosed to the defense, the result of the proceeding would not have been different." *See Kyles*, 514 U.S. at 435; *see Edgin*, 902 S.W.2d at 391. The jury heard evidence from Ms. Wallace and Sergeant Pitts about the heroin and cocaine retrieved from Ms. Wallace's body, and the TBI forensic scientist testified regarding the identity and weight of each controlled substance. We note that the defense has not challenged the identity of the controlled substances or their respective weights and that the defense theory of the case was the Defendant did not have possession of the heroin and cocaine. The Defendant is not entitled to relief based upon the State's failure to disclose before the trial the existence of the photographs.

### III.    Sentencing

The Defendant contends that the trial court erred by denying his request for alternative sentencing and by imposing consecutive service. The State responds that the court did not abuse its discretion. We agree with the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the thirty-three-year-old Defendant had previous convictions in Alabama for three counts of felony marijuana possession, possession of a schedule I drug in a prohibited zone, felony drug possession, misdemeanor drug possession, four undefined traffic offenses, misdemeanor failure to appear, three violations for driving when his license was revoked, and "Alabama conspiracy – traffic M." The Defendant likewise had previous convictions in Texas for two counts of felony drug possession, and the report reflects that he successfully completed probation for those convictions.

The presentence report reflects that ten days after the offenses in the present case, the Defendant was arrested in Alabama for felony marijuana possession and possession of a schedule I drug in a prohibited zone and was ultimately convicted. Although the sentencing hearing in the present case was November 20, 2018, the Defendant was sentenced to six years' probation on May 5, 2018 in connection with the Alabama drug charges. The report reflects that the Defendant told his Alabama probation officer the present case involved traffic violations and that the probation officer had been unaware of the felony drug possession convictions in this case.

-21-

The Defendant reported that he became involved with the juvenile justice system as a result of a joyriding incident and that he obtained his GED as a condition of his probation. The Defendant reported using cocaine, marijuana, steroids, and heroin. He stated that he had a "heavy dependency" on heroin and alcohol and that he had never been referred to a substance abuse treatment program. The Defendant reported having a good medical history, although he suffered from hypertension and seizures. The Defendant reported having good mental health, as well. The Defendant reported that he had been self-employed most of his life and had worked at a car dealership for about two years.

The Defendant provided a statement, in which he denied having possessed the drugs. He stated that he had not had any legal troubles since 2003, that he provided for five children, that he needed to be able to provide for his unborn child, and that he apologized for not being there for his family when they needed him most. He requested leniency from the trial court.

Certified copies of judgments of conviction were received as an exhibit and showed that the Defendant had five previous felony convictions, three of which were from Alabama and two of which were from Texas.

The trial court determined that the Defendant was a Range I, standard offender after consideration of the out-of-state convictions. Regarding mitigation evidence, the court found that the Defendant possessed a considerable amount of heroin and cocaine that was "enough to kill a horse, maybe more." The court declined to apply any mitigating factors. *See* T.C.A. § 40-35-113 (2018).

The trial court applied enhancement factor (1) based upon the Defendant's previous convictions. *See id*. § 40-35-114(1) (2018) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court declined to apply enhancement factors (8) and (13) after concluding that the Alabama offenses resulting in probation occurred about ten days after the present offenses. The State conceded that it had miscalculated and that the Defendant was not serving a sentence on probation at the time the present offenses were committed. The court determined that after the Defendant was released on bond in the present case, he committed an Alabama offense one week later and that he was convicted of the Alabama offenses in May 2018. *See id*. § 40-35-114(8) ("Before trial or sentencing, the defendant failed to comply with the conditions of a sentence involving release into the community[.]"); -114(13)(C) ("At the time the felony was committed, . . . the defendant [was] . . . [r]eleased on probation[.]").

In determining the length of the sentences, the trial court determined that in addition to his previous felony convictions, the Defendant had previous misdemeanor convictions for failure to appear, drug possession, driving when his license had been revoked, and traffic violations. The court imposed twelve-year sentences for each conviction. The court imposed consecutive service of the sentences in this case with the Alabama sentence because the Defendant was on bond in Tennessee when he committed the Alabama offenses.

The trial court determined that the Defendant was an offender whose history of criminal activity was extensive. *See id*. 40-35-115(b)(2) (2018). The court found that the number of convictions, which involved felonies and "a smattering of misdemeanors" warranted consecutive service. The court noted the large amount of heroin and cocaine and the value of the drugs. The court found that although it was "mindful" that some of the Defendant's convictions occurred as a young adult, the Defendant had seven felony convictions by his mid-thirties.

The trial court considered the presentence report, the Defendant's physical and mental conditions, the nature of the offenses, and the evidence presented at the pretrial hearings, the trial, and the sentencing hearing. The court found that the Defendant had not taken "ownership of the situation" because he continued to deny that he possessed the drugs. The court determined that the Defendant failed to recognize the distinction between actual and constructive possession. The court believed that Ms. Wallace was "somewhat of a victim" because the Defendant had used her to "be his cover while he was trafficking drugs." After considering the Defendant's criminal history, the court determined that the probability of rehabilitation was "not very good." The court noted that the Defendant had not been convicted of a crime in approximately fifteen years but found that he did not disclose to his Alabama probation officer that the present offenses involved drugs. The court found that the Defendant reported traffic violations to his Alabama probation officer. The court considered the Defendant's dishonesty and lack of candor in this regard as a factor against alternative sentencing.

The trial court found that, based upon the Defendant's criminal history and the circumstances of the offense, confinement was necessary to protect society from the Defendant's possible future criminal conduct. The court determined that the amount of heroin and cocaine, along with the manner in which the drugs were imported into Lincoln County, was a "huge consideration." The court found that an alternative sentence would unduly depreciate the seriousness of the offense. The court determined that the Defendant was not a suitable candidate for an alternative sentence.

The Defendant subsequently filed a motion for a reduction of sentence pursuant to Tennessee Rule of Criminal Procedure 35 on the basis that the effective sentence was

excessive. In a written order, the trial court determined that concurrent sentences were "too slight in relation to the facts of this case and the [D]efendant's history" but stated that it had "misgivings about its own logic and the total length of the sentence as perhaps some too much." The court reduced the twelve-year sentence for possession with the intent to sell 0.5 gram or more of cocaine to eight years but declined to modify the consecutive service of the sentences, for an effective twenty-year sentence to be served consecutively to the Alabama drug case. The court determined that an effective twenty-year sentence was consistent with the principles of sentencing and the circumstances of the offenses.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The standard of review for questions related to probation or any other alternative sentence, including community corrections, is an abuse of discretion with a presumption of reasonableness for within-range sentences reflecting a decision based upon the principles and purposes of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant who is ineligible for probation might still be a candidate for community corrections. *Id*. § 40-36-106(a)(1)(A) (2014); *see State v. Kendrick*, 10 S.W.3d 650 (Tenn. Crim. App. 1999). A defendant who is a felony offender and would otherwise be unfit for probation due to a history of drug or alcohol abuse or

mental health problems and "whose special needs are treatable and could be served best in the community rather than in a correctional institution" may be eligible for community corrections. T.C.A. § 40-36-106(c) (2014). The burden of establishing suitability for an alternative sentence rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Russell*, 773 S.W.2d 913, 915 (Tenn. 1989); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *Ashby*, 823 S.W.2d at 168; *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2018); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense

committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Relevant to the present case, "A defendant shall be eligible for probation . . . if the sentence actually imposed upon the defendant is ten (10) years or less; however, no defendant shall be eligible for probation under this chapter if convicted of a violation of . . . § 39-17-417(b)[.]" T.C.A. § 39-35-303(a) (2019). Possession with the intent to sell and to deliver heroin, a schedule I controlled substance, are Class B felonies. *Id*. §§ 39-17-417(b); 39-17-406(c)(11). As a result, the Defendant's convictions for possession with the intent to sell and possession with the intent to deliver heroin are not probation-eligible offenses regardless of the length of the sentence imposed. However, "eligibility for probation is not required for consideration of community corrections." *State v. Johnson*, 342 S.W.3d 520, 523 (Tenn. Crim. App. 2009). We note that after the trial court reduced the Defendant's sentence for possession with the intent to sell 0.5 gram or more of cocaine to eight years, the offense became eligible for probation in addition to community corrections.

The record reflects that the trial court considered the presentence report, the Defendant's physical and mental conditions, the nature of the offenses, the Defendant's likelihood of rehabilitation, and the evidence presented at the pretrial hearings, the trial, and the sentencing hearing. After considering the appropriate sentencing factors, the court imposed within-range sentences for the Defendant's Class B felony convictions. *See* T.C.A. § 40-35-112(a)(2) (2018) ("A Range I sentence . . . [f]or a Class B felony [is] not less than eight (8) nor more than twelve (12) years[.]").

Relative to the denial of alternative sentencing, the trial court determined that confinement was necessary to protect society from the Defendant because of his long history of criminal conduct. *See id*. § 40-35-103(1)(A). The presentence report reflects that the Defendant had seven previous felony convictions in Alabama and Texas, all of which involved controlled substances. In addition, the Defendant had misdemeanor drug-related convictions, along with convictions for failure to appear, traffic offenses, and driving when his license had been suspended. During the traffic stop, the Defendant admitted to Sergeant Pitts that he had purchased heroin and cocaine from the person in Atlanta approximately eight to ten times. One week after the Defendant was released on bond in this case, he was charged with felony drug offenses, for which he later received six years' probation, in Alabama.

Likewise, the trial court determined that confinement was necessary in order to avoid depreciating the seriousness of the offense. The court determined that the Defendant had failed to accept responsibility for his criminal conduct because he had continued to

deny that he had possession of the heroin and cocaine. The court determined that the Defendant "somewhat" victimized Ms. Wallace because he had used her to traffic drugs into Tennessee from another state. The court placed significant weight on the amount of heroin and cocaine seized in this case and the manner in which the drugs were imported to Tennessee. The record supports the court's determinations.

The record likewise supports the trial court's determination that the Defendant lacked the potential for rehabilitation. In addition the Defendant's previous convictions, he reported using cocaine, heroin, marijuana and steroids and having a "heavy dependency" on heroin and alcohol. Although the Defendant had not been convicted of a criminal offense in several years, the Defendant was dishonest with his Alabama probation officer regarding the nature of the present offenses, and his lack of candor weighed against an alternative sentence. *See State v. Souder*, 105 S.W.3d 602, 608 (Tenn. Crim. App. 2002) ("Candor is a relevant factor in assessing a defendant's potential for rehabilitation, and the lack of candor militates against the grant of" an alternative sentence.). Therefore, we conclude that the record supports the court's denial of alternative sentencing. The Defendant is not entitled to relief on this basis.

Relative to consecutive service of the twelve- and eight-year sentences, the trial court determined that the Defendant was an offender whose history of criminal activity was extensive. *See* T.C.A. § 40-35-115(b)(2) (2018). The presentence report reflects that the Defendant had multiple felony and misdemeanor convictions, many of which were drug-related. Although the court found that some of the Defendant's convictions had occurred when the Defendant was a young adult, he nonetheless had multiple felony convictions by his mid-thirties. Although the Defendant's criminal history does not reflect crimes of violence, the Defendant's convictions indicate a pattern of criminal conduct in connection to controlled substances. We note that the Defendant admitted to Sergeant Pitts that he had purchased heroin and cocaine from the person in Atlanta eight to ten times. Furthermore, the Defendant's Alabama felony drug convictions were committed after the Defendant was released on bond in the present case. *See* Tenn. R. Crim. P. 32(c)(3)(C) (requiring mandatory consecutive service "to a sentence for a felony committed while the defendant was released on bail and the defendant is convicted of both offenses"). The record supports the court's determinations and order of consecutive service. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-27-